ELLEN E. CHAMBERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41780.    Promulgated May 26, 1930.

*William S. Hammers, Esq.,* and *P. R. G. Sjostrom, Esq.,* for the petitioner.

*Maxwell E. McDowell, Esq.,* for the respondent.

## OPINION.

ARUNDELL: Section 202 of the Revenue Act of 1924, which deals with the determination of the amount of gain or loss, provides in subdivision (c) that:

The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

Petitioner asserts as her defense against the deficiency determined that the mortgage received in 1925 had no fair market value. The evidence consists of the testimony of petitioner's husband who negotiated the sale, two bankers to whom the mortgage was offered as collateral for a loan, and an officer of the mortgagor company.

Petitioner's husband, as far as the record shows, had no knowledge of the financial responsibility of the mortgagor. His claim that the mortgage had no fair market value is based on his failure to obtain a loan on it. While it may be as he says, that he could not have sold the property in December of 1925 for what it had cost in 1922, yet he had sufficient faith in the value of the mortgage that in 1926 he would not sell it at any substantial discount. One of the bankers to whom application for a loan was made would not accept the mortgage as collateral for the reason that his bank was not handling that kind

of paper. He frankly said he did not know whether the mortgage could have been sold for its face value or any part of it. The other banker refused the loan because he thought the mortgage called for more than the property was worth. He, however, had no personal knowledge of the financial responsibility of the mortgagor. The present secretary of the mortgagor company testified that the company was organized in 1925 for the purpose of taking advantage of the situation arising out of the proposed Biscayne Boulevard and limited its purchases of property to that vicinity. The plans for the boulevard broke down for awhile apparently because of the Keokuk Co.'s lack of capital, but this did not occur until 1926, and then powerful financial interests came to the rescue and supplied the money for the purchase of the outstanding mortgages. Whether this situation was known to the public in 1925 is not shown. This last witness, so far as the record shows, had no knowledge of the market value of mortgages in 1925.

In considering the evidence in this case, it is, we think, a fact of considerable importance that the sale by petitioner does not come within the category of the exploitation schemes such as we considered in *Georgia-Florida Land Co.*, 16 B. T. A. 1253, where the only security for the notes was " wild land, unimproved real estate that produced no income." Even under the facts in that case, the evidence established that the notes had some value. The situation here is entirely different. The property sold by the petitioner was improved, having on it a furnished dwelling, which would afford far greater security for the payment of the mortgage notes than was the case in the majority of the boom-period transactions. While the evidence as to the purchaser and its capitalization and method of operation is rather meager, it appears that it was not in the class of the typical speculator who hoped to complete the transaction by a quick resale, but that it was purchasing the property as a part of the project for developing the boulevard.

The evidence does not convince us that the mortgage held by petitioner in 1925 had no fair market value or that its value was any less than that found by the respondent. Cf. *Watson MacMaster et al.*, 18 B. T. A. 1119.

*Decision will be entered for the respondent.*